Lee, J.
delivered the opinion of the court:
The court is of opinion that in a proceeding by way of caveat to prevent the emanation of a grant for lands under the provisions of the act of March 1, 1819, or those of the Code of Virginia, all the facts material in the cause and not agreed by the parties should be found by the jury, or if a jury be dispensed with and the whole case submitted to the court upon the law and the facts, should be ascertained by the court; and that the facts so agreed, if any, and those so found by the jury or ascertained by the court necessarily become and should in every case be made a part of the record to the end that in the absence of pleadings in writing and a general verdict, the nature of the controversy and the character and effect of the judgment may distinctly appear and that the latter may be reviewed by the proper appellate tribunal.
And the court is further of opinion that if in such statutory proceeding by caveat the inferior court shall fail to certify and make part of the record, the facts proven by the evidence, but shall in lieu thereof certify the evidence itself, yet if it shall appear to the appellate court that there is no conflict in the parol evidence and that accepting the whole as true, it may *393 proceed safely to judgment upon the same, it is the duty of such court so to proceed and to give j udgment according to the very right of the cause.
And the court is further of opinion that in the parol testimony certified by the Circuit court in this cause there is no conflict nor discrepancy in any material particular, but that the same may fairly and properly be regarded as entirely consistent throughout and as devolving no duty or necessity upon the court to distinguish between the different witnesses or the different degrees of weight and credibility to which their testimony may be entitled; and that this court may safely proceed to review the judgment upon the certificate of the judge of the Circuit court together with the facts agreed in the cause, and that it is its duty so to proceed and to render its judgment between the parties upon the whole case.
And the court is further of opinion that to entitle the appellant to a review of the case upon the facts in this court, it was not necessary that he should have filed a bill of exceptions to the judgment of the Circuit court given in favor of the appellees nor that he should as upon a verdict by a jury in an ordinary action at law, have moved for a new trial of the cause, and if refused, have taken an exception to such refusal ; but that it was sufficient that the Circuit court should, as it did, make the facts agreed and its certificate of all the evidence documentary and parol, the latter being in no respect conflicting, part and parcel of the record (as a quasi special verdict) by an express order to that effect made upon rendering judgment, and that the same should now be considered by this court in the same manner and to all intents and purposes as fully as if such facts agreed and evidence had been made part of the record by a formal bill of exceptions signed and sealed for that purpose.
And the court is further of opinion that in passing *394 upon the matters in controversy in this cause, it is proper to consider, in connection, the act forming the counties of Ohio, Yohogania and Monongalia, passed in October 1776, (ch. 45), the act forming the county of Greenbrier passed in October 1777 (ch. 18), the act for dividing Monongalia county, passed May 1784 (ch. 6), the act of October 1786, (ch. 101) for dividing the county of Harrison, the act of the 4th of December 1787 (ch. 94) forming the county of Pendleton, the act of the 14th December 1790 (ch. 43) forming the county of Bath, the act of December 3, 1796 (ch. 56) annexing part of Bath to Pendleton, the act of December 21, 1821 (ch. 27) forming the county of Pocahontas, and the act of the 19th of March 1847 (ch. 56) forming the county of Highland, as being in a certain sense acts in pari materia, and aiding in the proper construction of the acts relating to Pendleton and Pocahontas counties and in defining the precise territory embraced within the limits of the same, respectively.
And the court is further of opinion that these acts being intended merely for the division and arrangement of the territory which they embrace for local municipal purposes and the convenient and economical administration of the government within the same should not be construed with the same strictness which is to be observed in the construction of a grant or of a contract between individuals affecting rights of property, but that a more liberal and beneficial rule should be adopted the object being to ascertain the true meaning and intention of the legislature in any given act by considering the same in connection with all others in pa.ri materia and with the general policy of the legislature and such intention to effectuate and carry out whensoever and wheresoever the same can be discovered.
And the court is further of opinion that in determining the territorial boundaries specified in said acts *395 due weight should be given to the cotemporaneous interpretation placed upon the same by the courts and other lawful authorities within the same and by the population at large residing therein : and that maps of such territory made out or published by authority of law may properly be referred to as persuasive evidence in support of the pretensions of either party to have such weight as consistently with the other testimony in the cause they shall appear to be entitled to.
And the court is further of opinion that the lands embraced by the entries of both parties in this cause were prior to the passage of the act entitled “ an act adding part of the county of Bath to the county of Pendleton” passed December 3, 1796, clearly within the boundaries of the county of Bath, but that by the provisions of said act, all that part of the said county of Bath within which said lands were situate, must be held and taken to have been stricken off from the-county of Bath and annexed to the county of Pendleton. For although upon the terms of said act it might appear to be doubtful whether the call for beginning “ on the top of the Alleghany mountain, the northwest side of the line of the county of Pendleton,” would not require that the beginning should be at some point on the Main Alleghany mountain (that lying east of the eastern fork or branch of Greenbrier river) as contended for by the appellant, or could be satisfied by beginning at a point on the mountain lying west of the north or western fork or branch of said river, (the same being from ten to fifteen miles distant from the line of Pendleton county as it then ran) as contended for by the appellees, yet considering that said last mentioned mountain was also recognized as a range of the Alleghany and was commonly known as the “Back Alleghany,” and that by the cotemporaneous construction placed upon the calls of said act by the County court of Pendleton in its order direct *396 ing the running of the lines supposed to be called for in said act, and the actual running of the same beginning at letter R on the plats of surveyors Johnson and Holloway thence S 68 E, 500 poles to a chesnut oak on a mountain at the lower end of John Slaven’s plantation, at the point designated by letter S, and that a report of such running was made to the said County court of Pendleton and was by said court accepted and recorded, as evidencing the true courses of the lines between the counties of Bath and Pendleton as established by said act: considering also that after the passage of said act exclusive jurisdiction over the territory in question was exercised by the courts and officers of Pendleton county without claim or contestation on the part of the authorities or people of Bath county, which jurisdiction was recognized by the court of the adjoining county of Randolph in its official acts, as within the rightful authority of the court of Pendleton county : and further, as in the act erecting the county of Pocahontas passed on the 21st of December 1821, there is a call for a straight line from the top of the mountain between the Valley river and mouth of the Dry fork of Elk river where the road from Clover Lick to Randolph court-house crosses said mountain, to where the line of Pendleton county intersects the line of Bath and Randolph counties on the top of the mountain between Greenbrier and Cheat rivers, and a call to run thence with the top of the said mountain to where the road leading from Slaven’s to Randolph court-house crosses it, which calls cannot be satisfied by running the lines of the territory annexed to Pendleton by the act of 1796 according to the pretensions of the appellant but are fully satisfied by the points R and P and the line on the top of the Back Alleghany between them, according to the pretensions of the appellees, and are therefore to be regarded as a legislative interpretation of the act of *397 1796 and as demonstrating that the beginning of the boundary of the territory thereby proposed to be annexed to Pendleton was and is upon the Back Alleghany and not the Main Alleghany and at or near the point B as claimed by the appellees; and, moreover, as there is no sufficient nor scarcely any conceivable reason why the legislature should have annexed that portion of the county of Bath lying south of a line running from some point on the top of the Main Alleghany mountain to the lower end of John Slaven’s plantation to the county of Pendleton leaving out and retaining as part of the county of Bath though connected with the body of the county only by the narrow neck of land on the mountain from S to B, all that territory lying north of said line according to the pretensions of the appellants; and as that construction which annexed the whole of said territory to the county of Pendleton was accepted by the population within its boundaries, generally, and by the people of the adjoining counties, as expressing the true intent and meaning of said act, the conclusion to which the court must be brought is that the call for the northwest side of the Pendleton line must be rejected as conflicting with the intention of the legislature or that it must be so corrected or its literal meaning so modified, that the beginning of the boundary of the annexed territory must be placed at or near letter B, running thence to S, thence to Dinwiddle’s gap thence with the other calls designated in the act to the Pendleton line and that all the territory north of the lines from B to S and thence to Dinwiddie’s gap comprehending the whole of both forks of the Greenbrier up to the lines of Bandolph county including all the lands covered by the entries of the parties in this cause was thus annexed to and made part of the county of Pendleton.
But the court is further of opinion that at the time *398 of the passage of the act of the 21st of December 1821 for the formation of the county of Pocahontas it would appear to have been the general policy of the legislature as evinced by various acts of legislation before and after, to establish and preserve the top of the Main Alleghany mountain as the line of boundary between the adjacent counties on either side, from which policy at the date of said act there appear to have been no existing variations except in the instances of the counties of Montgomery and Monroe as to which from the depression and flattening of the Alleghany ridge in that particular section, the reason founded on the greater convenience and accessibility to the population did not apply with equal force, and except the instances of the counties of Bath and Pendleton which latter county embraced so much territory west of the Alleghany as lay between the Main Alleghany and the Back Alleghany northwardly of the lines from R to S and from thence to the Main Alleghany in the direction of Dinwiddie’s gap and which had been annexed to the said county of Pendleton by the act of 1796; and that in the construction of the various acts touching the territorial boundaries of 'counties, this policy should be duly considered and respected, and no intention to depart therefrom should be imputed to the legislature except it be plainly expressed or its purpose to do so be sufficiently manifested,- and in the absence of such plain expression or manifest purpose the general intent to establish the top of the Alleghany as the line of county boundaries, should be effectuated, and that the calls in such acts should be reconciled and harmonized, for that purpose a particular call which taken literally would conflict with the intent of the act should be disregarded or modified and any error in the same arising from an imperfect knowledge of the topography of the country or any other fortuitous cause should be corrected.
*399 And the court is further of opinion that in the arrangements of the territory of the state for county municipal purposes, it has also been the general licy of the general assembly to avoid inconvenient elongations and awkward or undue contractions of the territory of a county, and to preserve the same in as compact a form as practicable, and especially for reasons of high public necessity and convenience, to keep the same in one body and avoid the detachment of any part of a county from the residue by the interposition of any other county; and that in the construction of such acts it should be presumed that such was the intention of the legislature and no different interpretation should be admitted unless the contrary be plainly expressed or it shall appear that the legislature did intend to depart from the policy which had hitherto prevailed upon that subject.
And the court is further of opinion that there was no sufficient or conceivable reason why the legislature in forming the said county of Pocahontas should have left that portion of territory on the heads of the two forks of Greenbrier (the territory northwardly of the line P Y) within the limits of the county of Pendleton and that the reason why it is to be supposed it was the intention of the act of 1796 to annex the said territory to Pendleton comes with equal or greater force to demonstrate that it was the intention of the act of the 21st of December 1821 to embrace the same within the limits of the county of Pocahontas, thereby erected. And the court is of opinion that the legislature did intend by said act to restore to the county of Pendleton its former boundary along the top of the Alleghany mountain and to embrace all of its territory which lay west of that line within the said county of Pocahontas; and that the legislature believed it had done so is plainly inferrible from the provisions of the act forming Highland county out of parts of Pendle *400 ton and Bath counties passed March 19, 1847. This ac^ erects the new county out of territory on the east of the Alleghany without including any lying on ^ weg£ gjc|e. an(j ^ jg impossible to suppose, if a Por^on Pendleton county had at that time lain on the west side of the Alleghany, the legislature would not have included it in the county of Highland but would have suffered it to remain part and parcel of Pendleton county though detached and separated from it by the intervening county of Highland when it might just as well and every consideration of public policy and convenience required that it should form, part of the county of Highland which it adjoined. That such was the belief of the legislature is also apparent from the act of the 24th of March 1838 providing for a reassessment of the lands in this commonwealth ; for whereas by the third section of the act of February 18, 1817, the counties of Bath and Pendleton, as well as the counties of Monroe and Montgomery, are described as lying on both sides of the Alleghany, yet after the passage of the acts forming said counties of Bath and Pocahontas, by the said act of 1838, when the legislative mind was directed to the very question, the counties of Bath and Pendleton are embraced in a district composed of counties lying between the Blue Ridge and Alleghany and the counties of Monroe and Montgomery, only, are still described as lying on both sides of the Alleghany. And these acts may fairly and properly be considered in connection with the act forming Pocahontas county as supplying a legislative interpretation of the meaning and intent of the legislature in the provisions of said last named act.
And the court is further of opinion that in giving locality to the points called for as corners in said act, the terminus of the line from the top of the mountain between the head of the Valley river and the mouth *401 of tlie Dry fork of Elk river to where the line of Pendleton county intersects the line of Bath and Eandolph counties is to be placed at or near letter E the plats, and that of the line thence with the top of the mountain to where the road leading from Slaven’s to Eandolph court-house crosses it, is at letter P ; but that the terminus of the line to the top of tlie Alleghany mountain opposite the head of the East fork of Greenbrier river is not at a point opposite the head of an eastern branch of the fork of Greenbrier known as the East or South fork as claimed by the appellees, but is to be sought on the top of the Alleghany mountain opposite to the head of the main or longest branch of said fork: that the East fork of said river intended by said act was the main fork running along the foot of the Main Alleghany, the head of which was the head of its longest branch; and consequently the boundary line between the top of the Back Alleghany or Green-brier mountain and the top of the Main Alleghany is not the line P Y as contended for by the appellees, such line neither satisfying the literal call of the act nor in the opinion of this court being the boundary intended by the legislature, inasmuch as it would according to the appellant’s pretensions entirely cut off from the body of the county of Pendleton a portion of its territory lying west of the Alleghany mountain, or if as the appellees contend, it would not entirely sever it, it would yet even according to their pretensions leave it connected with the rest of the county by a narrow neck of land not exceeding one hundred poles in width and stretching out from such neck in a southwestern direction from fifteen to eighteen miles; and if such portion wrere not so severed and disconnected by that line, it would certainly be so upon the formation of Highland county which took off all the southern part of Pendleton east of the Alleghany, all which would be contrary to the general policy and plain intention *402 of the legislature. Whilst in running the boundary from P to the top of the Alleghany opposite to the head of the East or South fork of the Greenbrier, to carry out the intention of the legislature, it would seem not unreasonable, and would do no violence to the approved rules of construction to assume that one or more calls may have been omitted or that the call for a straight line from P was made in mistake arising from the very imperfect knowledge, as it is proven to have been, of the exact topography of the mountain region in question, and to supply such omitted calls or disregard such repugnant call or so corréct it or modify its literal import that the said boundary might be run along the top of the Back Alleghany or Greenbrier mountain, with the Randolph county line until it reaches the top of the Main Alleghany at a point opposite to the head of the longest branch of the South or right hand fork (ascending) of the Greenbrier river, so as to embrace the whole of the territory annexed to the county of Pendleton by the act of 1796 which lay northwardly of the line from P to the top of the Main Alleghany in the direction of Dinwiddie’s gap, and between the boundary of Randolph county on the Back Alleghany and the top of the Main Alleghany, within the limits of the county of Pocahontas.
And it appearing to the court that this construction of the act forming Pocahontas county is supported by the cotemporaneous exposition thereof by the courts and other authorities of Pocahontas county in exercising immediately after its passage exclusive jurisdiction over said territory without question in any quarter, by the complete surrender of such jurisdiction by the courts and other authorities of Pendleton county, by its recognition by the general assembly in repeated acts of subsequent legislation, by the representation of county boundaries on maps prepared and published under the authority of the legislature and *403 in conformity with the provisions of laws requiring the exterior boundaries of the counties to be laid down by actual survey or by reference to one or more actual surveys and strict accuracy to be observed in denoting the true position of the corners of adjacent counties, and by its universal acceptance as the true construction by the people generally from the passage of the act until the origin of the present litigation, the court is of opinion that this construction should prevail and should be adopted by this court as the true exposition of the act in question.
And it appearing to the court that the foregoing views and opinions of the court are decisive against the pretensions of the appellees, it is deemed unnecessary to express an opinion upon any other question arising in the cause.
The judgment of this court therefore must be that the judgment of the Circuit court be reversed with costs to the appellant, and that the caveat be dismissed with costs to the caveatee in the Circuit court.
Judgment reversed.